## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                              )
**WILLIAM DAVIS,**                            )
**6253 Catalina Drive, #714**                 )
**North Myrtle Beach, SC 29582**              )
                                              )
     **Plaintiff,**  )
                                              )
**v.**                                        )     **Case No. _____**
                                              )
**JEFF SESSIONS,**                            )
**As the Attorney General**                   )
**Of the United States,**                     )
**United States Department of Justice**       )
**950 Pennsylvania Avenue, NW**               )
**Washington, DC 20530-0001**                 )
                                              )
     **Defendant.** )
_____ )

## COMPLAINT AND DEMAND FOR JURY TRIAL

William Davis, by and through his undersigned counsel, hereby files this Complaint and

Demand for Jury Trial against Jeff Sessions, as the Attorney General of the United States, for

discrimination, hostile work environment, and retaliation in violation of the Civil Rights Act of

1964, as amended, 42 U.S.C. 2000e *et seq.* ("Title VII"), and for discrimination, denial of

reasonable accommodation, and hostile work environment in violation of the Rehabilitation Act,

as amended, 29 U.S.C. § 790 *et seq.* ("Rehabilitation Act").

## PARTIES & JURISDICTION

1.     Mr. Davis is an African-American male.  Mr. Davis was employed by the United

States Department of Justice, Federal Bureau of Prisons (the "Bureau") for more than 20 years

until his recent retirement on December 31, 2017.  Mr. Davis' official duty station prior to his

retirement was at the Bureau's central office, located at 3201 1st Street, NW, HOLC Building, Washington, D.C. 20534.

2.      Defendant Jeff Sessions is the Attorney General of the United States and the head of the United States Department of Justice.  The Bureau, which is a division of the Department of Justice, is an agency as that term is defined in 5 U.S.C. § 552(a)(1) for the purposes of 42 U.S.C. § 2000e-16(a).  The Bureau is also an agency within the executive branch of the United States Government for purposes of 29 U.S.C. § 791(b).  Jeff Sessions is sued in his capacity as Attorney General and head of the United States Department of Justice.

3.      Jurisdiction is proper in this Court pursuant to 42 U.S.C. § 2000e-16(c) and 28 U.S.C. § 1331 relating to "any civil action or proceeding arising under any Act of Congress regulating commerce."

4.      Venue is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b), as Mr. Sessions is the head of a governmental agency of the United States that does business in and is headquartered in the District of Columbia.  In addition, Mr. Davis worked in the Bureau's central office located in the District of Columbia, many decisions made and events giving rise to this action occurred in the District of Columbia, and key documents, including employment records, and witnesses are located in the District of Columbia.

5.      Mr. Davis filed a formal complaint of discrimination with the Bureau's Equal Employment Opportunity Office ("EEO Office") on August 5, 2016, alleging discrimination, retaliation, and hostile work environment on the basis of his race (African-American) and disability (mental/Post-Traumatic Stress Disorder ("PTSD")).  The Bureau issued a Final Agency Decision on October 27, 2017.  It has been less than 90 days since the Final Agency Decision

was issued.  Accordingly, Mr. Davis exhausted his administrative remedies and may pursue his claims in this Court.

## FACTS

### History of Employment at the Bureau and Promotion to Central Office

6.      Mr. Davis' career with the Bureau spanned more than two decades.  He originally joined the Bureau in 1995 and consistently worked his way up through the agency through a series of merit-based promotions.

7.      At each step along the way, Mr. Davis proved to be a valuable, hard-working and exceptional employee who met all of the Bureau's legitimate expectations for his employment. Indeed, his outstanding performance was the very reason he was able to earn his merit-based promotions and rise from a GS-5 to a GS-12 during his career.

8.      Mr. Davis' last promotion occurred in October 2014 when he became a GS-12 Management Analyst in the Bureau's central office working in the Program Review division.

9.      Upon earning the promotion, Mr. Davis began reporting directly to Joseph Pecoraio, a Caucasian male.  Mr. Pecoraio remained Mr. Davis' first-line supervisor until October 2016, at which time he became Mr. Davis' second-line supervisor, as detailed below.

10.      Mr. Davis was one of just two African-Americans reporting to Mr. Pecoraio in his division when he joined the central office.  The other African-American was Nicole Hines.  The other four employees in his division were Caucasian or Hispanic. During the remainder of his employment with the Bureau, no other African-Americans were hired in Mr. Davis' division.

11.      As with his prior positions, Mr. Davis again was a hard-working and dedicated employee as a Management Analyst and met all of the Bureau's legitimate expectations for his employment.

**Start of Discrimination**

12.     Immediately upon Mr. Davis coming under Mr. Pecoraio's supervision in the

central office, Mr. Pecoraio set Mr. Davis up for failure, treated Mr. Davis in a hostile and

antagonistic manner, and treated Mr. Davis (and Ms. Hines) differently than he treated his other

non-African-American employees.  Over the ensuing two years, on a weekly, if not daily, basis,

Mr. Pecoraio unfairly and harshly criticized Mr. Davis' work, blamed Mr. Davis for the work of

others, refused to give Mr. Davis appropriate training or instruction, spoke in a harsh,

disrespectful, and condescending manner to Mr. Davis, dismissed Mr. Davis' suggestions,

requests, and proposals out of hand, embarrassed Mr. Davis in front of his colleagues, made lewd

or obscene gestures to Mr. Davis, papered Mr. Davis' personnel file with false criticism in an

effort to either set up his termination or force his retirement or resignation, and otherwise took

steps to ostracize Mr. Davis in the office and stunt his career.

13.     The treatment Mr. Davis (and Ms. Hines) suffered is in fact indicative of a larger

pattern of discrimination.  Currently pending is a class action suit alleging that the Bureau

discriminates against African-Americans and retaliates against African-American employees

who bring EEO claims.

14.     For the first ten months Mr. Davis worked directly under Mr. Pecoraio, Mr.

Pecoraio was verbally demeaning and hostile towards Mr. Davis.  Mr. Pecoraio treated him in an

abrupt and disrespectful manner, both privately and in front of Mr. Davis' colleagues.  Mr.

Pecoraio often unfairly criticized Mr. Davis in front of his colleagues and complained about Mr.

Davis' work when there was no reason to do so.  When Mr. Davis in turn asked for guidance or

training, Mr. Pecoraio refused.  Instead, he knowingly assigned Mr. Davis to tasks that he had

not been trained to handle, waited for Mr. Davis to submit his work, and then criticized it unfairly. Mr. Davis also watched as Mr. Pecoraio treated Ms. Hines in a similar manner.

15.    In contrast, Mr. Pecoraio treated his non-African-American employees with respect and showed them appreciation for their work. He often praised their efforts and provided them with positive reinforcement, whereas he was only negative with Mr. Davis and Ms. Hines.

16.    In fact, Mr. Pecoraio consistently refused to provide Mr. Davis (or Ms. Hines, for that matter) with the requisite training to perform his duties. Although Mr. Davis requested training to perform, for example, audit letters, which were a critical component of his duties, Mr. Pecoraio refused. Instead, when Mr. Davis submitted audit letters, Mr. Pecoraio would criticize Mr. Davis, despite giving Mr. Davis no guidance or training and despite the fact that Mr. Davis' audit letters were consistent with those prepared by other non-African-American employees.

17.    Having not received or been approved for training by Mr. Pecoraio, Mr. Davis sought out his own training from a Strategic Planning Analyst, Jason Stiles. Mr. Stiles provided Mr. Davis training in the area of audit letters and gave him insights into the process of generating the letters.

18.    Shortly after Mr. Davis was trained by Mr. Stiles, Mr. Pecoraio learned of the training. Mr. Pecoraio immediately verbally attacked Mr. Davis for seeking out training on his own, even though it did not detract from his other duties and responsibilities. Mr. Pecoraio also reprimanded Mr. Stiles for providing the training and instructed him to not train Mr. Davis or Ms. Hines in the future. Mr. Pecoraio was upset that his plan to block Mr. Davis from succeeding was undermined by his receipt of mad that Mr. Davis received training which would aid him in the performance of his duties and allow him to succeed in the office.

19.     During this period, Mr. Pecoraio also refused to issue Mr. Davis a blackberry or laptop for travel, which he issued to the other non-African-American Analysts.  This inhibited Mr. Davis' ability to do his work on the road, which was a significant area of his responsibilities.

20.     In August 2015, Mr. Pecoraio's hostile treatment of Mr. Davis escalated.  On August 26, 2015, Mr. Pecoraio issued Mr. Davis a false, unfair letter of reprimand alleging that Mr. Davis had failed to meet a deadline.  The project at issue was not Mr. Davis' responsibility and he had no role in the missed deadline.  Mr. Pecoraio even acknowledged that the missed deadline was not Mr. Davis fault, but issued the reprimand anyway to "get [his] attention."

21.     This August 2015 letter was the first of multiple instances in which Mr. Pecoraio wrote memoranda or letters of reprimand falsely criticizing Mr. Davis' work, which was a clear effort to paper his personnel file with false negative criticisms.

22.     In August 2015, Ms. Hines filed an EEO discrimination complaint against Mr. Pecoraio.  The mistreatment Ms. Hines suffered and sought recover for was nearly identical to that suffered by Mr. Davis—she was given unfair ratings, falsely criticized for her performance, and was denied a reasonable accommodation for her disability.  Ms. Hines named Mr. Davis as a witness in her case and, in August 2016, Mr. Davis was interviewed and offered testimony in support of her discrimination claim.  Mr. Pecoraio learned that Mr. Davis was named as a witness shortly after the complaint was filed.  Mr. Pecoraio eventually terminated Ms. Hines.

23.     Subsequently in October 2015 Mr. Davis was called to a meeting with Mr. Pecoraio.  During that meeting, Mr. Pecoraio asked Mr. Davis to share his thoughts about Mr. Pecoraio's management style.  Mr. Davis was uncomfortable with the question and believed that Mr. Pecoraio would use whatever answer he gave against him.  Mr. Davis gave an honest answer

that he hoped for more training and guidance in his work so as to meet the expectations Mr.

Pecoraio was expressing for him.

24.     Within days of his meeting with Mr. Pecoraio, Mr. Davis was called to a meeting

with Paul Layer, the Assistant Deputy Director and Mr. Pecoraio's superior.  During that

meeting, Mr. Layer stated that he wanted to hear Mr. Davis' thoughts on Mr. Pecoraio's

management style.  From the line of questioning from Mr. Layer, it was clear to Mr. Davis that

Mr. Pecoraio had gone to Mr. Layer following Mr. Davis' meeting with him and claimed that

Mr. Davis had unfairly criticized him.  Although he was again uncomfortable with the question,

Mr. Davis responded honestly as he had during his first meeting and told Mr. Layer that he

hoped for more training and guidance.

25.     Just a few days after Mr. Davis met with Mr. Layer, Mr. Pecoraio again asked to

meet with Mr. Davis.  During that meeting, on October 26, 2015, Mr. Pecoraio immediately

verbally attacked Mr. Davis, stating that Mr. Davis had supposedly "reported" Mr. Pecoraio to

his boss.  Mr. Davis tried to correct Mr. Pecoraio's misconception and explain that Mr. Layer

had asked Mr. Davis for his input, just as Mr. Pecoraio had, apparently based on Mr. Pecoraio

himself reporting the issue to Mr. Layer.  During this meeting, it was clear that Mr. Pecoraio

took issue with his African-American subordinate offering any criticism, fair or not, of his

management.

26.     At the end of the October 26, 2015 meeting, Mr. Pecoraio notified Mr. Davis that

he was being removed from the travel schedule for external audits, which was an absolutely

critical piece of Mr. Davis' responsibilities.

27.     As a Management Analyst, Mr. Davis was responsible for oversight of Bureau

programs to ensure compliance with laws, rules, and regulations.  A primary focus of Mr. Davis'

position was ensuring humane and safe conditions and practices in the Bureau programs through on site monitoring and inspection and program review via what the division referred to as external audits.

28.     Travel and on-site visits of the Bureau's various institutions was always an integral part of the Management Analyst position and a principal reason Mr. Davis accepted the position.  Mr. Davis' position description stated that his responsibility was "[c]onducting special reviews and surveys, making technical assistance visits to gather data, and following up on possible program areas."  His position description also specifically noted that "[t]ravel is required" and that his duties were to be performed at times at "regional offices, correctional institutions, staff training centers and other offices at DOJ."  Travel made up 75% of the position responsibilities.  The primary reason Mr. Davis accepted the position and moved from North Carolina to D.C. was this opportunity to travel.

29.     Travel and on-site visits was also a huge career and promotion opportunity.  The travel increased Mr. Davis' exposure in the Bureau, increased his professional network, and offered him an avenue of performing outstanding work in a very high-profile, front-facing way. Indeed, for the past year, Mr. Davis had received tremendous positive feedback on his site visits and external audits, both from within the central office and from the remote facilities and institutions.  This was setting Mr. Davis up for a tremendous promotion opportunity to higher level Analyst positions at the GS-13 and GS-14 level, which were often given to individuals with extensive external audit and on-site experience.  By removing his travel opportunities and on-site visits, Mr. Pecoraio severely restricted and stunted Mr. Davis' career and put on hold the career Mr. Davis had spent more than two decades fostering.

30.     Preceding Mr. Davis' removal from the travel schedule, Mr. Pecoraio had also removed Ms. Hines from the travel schedule in April 2015.  Mr. Pecoraio allowed all of his other analysts in the division travel without restriction.  This included new hires as well.  In some cases, new analysts were permitted to travel without restriction within a month of their hire date.

**History of Disability, Need for Leave, and Improper Medical Inquiry**

31.     Following the October 26, 2015 meeting when Mr. Davis was removed from the travel calendar, Mr. Davis reached out to the Bureau's Employee Assistance Program ("EAP") to speak with a counselor.

32.     Mr. Davis has a history of depression and anxiety.  He was first officially diagnosed with depression and anxiety in 2007.  As a result of his depression and anxiety, Mr. Davis has suffered from periods of sleeplessness, loss of appetite, nervous tics and severe and debilitating introversion.  When the depression and anxiety flares up, Mr. Davis is rendered completely incapable of performing work.  The periods of depression and anxiety are typically precipitated by a "stressor," some sort of stressful event or series of events.

33.     Although he was first diagnosed with depression and anxiety in 2007, the symptoms associated with those disorders date back to Mr. Davis' time in the military.  In particular, Mr. Davis began suffering from depression and anxiety following an incident in which he was attacked by his fellow members of the Marine Corp.  The attack left Mr. Davis disabled and led to his disability discharge from the Marines.  The Marines who attacked Mr. Davis were all Caucasian.

34.     Mr. Pecoraio's behavior served as a stressor for Mr. Davis.  As a result of Mr. Pecoraio's constant, antagonistic, belittling, and embarrassing conduct, Mr. Davis began to suffer from bouts of depression and anxiety, sleeplessness, loss of appetite, loss of concentration, and a

9

general fear of going to work.  This impacted Mr. Davis' ability to work, or even to find the motivation to go to work.  Mr. Davis also suffered from suicidal ideation.  Nevertheless, Mr. Davis persisted and continued to provide outstanding work while suffering from internal turmoil.

35.     Mr. Pecoraio's actions over the end of October 2015 left Mr. Davis in a severe fit of depression and anxiety.  Mr. Davis met with his EAP counselor and his primary care physician, both of whom confirmed his diagnoses of depression and anxiety.  Mr. Davis' primary care physician in particular indicated that his depression fell within the "severe" classification and that he was suffering from an "emotional crisis," another clinical diagnosis.  In addition, he was diagnosed with high blood pressure and given medications to treat the high levels.

36.     Mr. Davis was also later referred to another health care provider in late December 2015.  The new health care provider diagnosed Mr. Davis with Post Traumatic Stress Disorder ("PTSD") stemming from his time in the military.  The new health care provider stated that his work conditions were a stressor triggering his PTSD.

37.     As a result of Mr. Davis' diagnoses and the symptoms from which he was suffering, and based on the concurring recommendation of Mr. Davis' physician, Mr. Davis' EAP counsel recommended that Mr. Davis take a leave of absence to treat his symptoms and disorders and get his blood pressure under control.

38.     In addition, Mr. Davis' counselor, with the concurrence of his primary care physician, also recommended that Mr. Davis be accommodated by being removed from the supervision of Mr. Pecoraio, who acted as a stressor for him.  They specifically recommended that he be transferred to another division under less stress, which would cause Mr. Davis to shut down and prevent him from being able to perform his work.  With an appropriate transfer, Mr. Davis would be fully capable of performing all tasks and assignments required of him.

39.     Based on the recommendation of his health care providers, Mr. Davis spoke with Mr. Pecoraio in December 2015 and asked for a medical leave of absence.  During his career, Mr. Davis had accrued a large bank of paid time off, which he told Mr. Pecoraio he intended to use to take the leave.  Rather than allow Mr. Davis to take the leave as requested, Mr. Pecoraio first demanded to know specifics regarding Mr. Davis' need for leave.   Mr. Davis told Mr. Pecoraio of his symptoms, his diagnoses, and his need for leave to receive treatment.  Under pressure from Mr. Pecoraio, Mr. Davis also relented and told Mr. Pecoraio that his depression, anxiety, and PTSD had been triggered by Mr. Pecoraio's conduct.

40.     Mr. Pecoraio's questions were not directed to determining Mr. Davis' capacity to perform work, but were instead designed to be invasive and shame Mr. Davis into staying at work without taking leave.

41.     Mr. Pecoraio also tried to discourage Mr. Davis from taking extended medical leave under, for example, the Family and Medical Leave Act.  Instead, Mr. Pecoraio insisted that Mr. Davis report back to him every week about his condition and whether he could return to work.  In doing so, Mr. Pecoraio made clear that he disfavored anyone needing to take extended leave due to a mental illness or disability.

42.     Despite Mr. Pecoraio's attempts to compel Mr. Davis to only take a brief period of paid time off and report through him, based on the recommendation of his treating health care providers Mr. Davis took an extended period of leave from December 3, 2015 to June 6, 2016, during which time he received regular medical and mental health treatment.

43.     Prior to and during his absence, Mr. Davis submitted medical documentation supporting both his need for leave and his diagnoses to the Bureau.  At all times, from their conversations and the information Mr. Davis provided to the Bureau, Mr. Pecoraio was fully

aware of Mr. Davis' condition, his diagnoses, and his treatment, including the fact that Mr. Davis' symptoms were triggered by the hostile and stressful environment Mr. Pecoraio subjected him to.

44.     On May 19, 2016, Mr. Davis' primary care physician cleared him to return to work, effective June 6, 2016.  Mr. Davis submitted the medical clearance letter to the Bureau's Human Resources office which had been handling his leave.  He also delivered a copy to Mr. Pecoraio.

45.     Eight days later, on May 27, 2016, Mr. Pecoraio sent an eight-point letter to Mr. Davis' physician asking for extremely detailed medical information regarding Mr. Davis' condition and its impact on his life.

46.     The letter from Mr. Pecoraio went beyond seeking information only to determine whether Mr. Davis was capable of performing his duties.  Instead, the letter asked for detailed information concerning Mr. Davis's diagnosis, "clinical status," future treatment, and the impact of his conditions on him outside of work.

47.     The letter also falsely stated that "Mr. Davis has provided an authorization for release of all information regarding his medical history and releasing you from any liability as a result of complying with this request."  Mr. Davis never signed any such release or gave any such authorization to anyone within the Bureau.

48.     Mr. Pecoraio sent the letter despite having a medical clearance from Mr. Davis' physician clearing him to return to work and despite the fact that he had been kept apprised of Mr. Davis' condition during his absence.  Mr. Pecoraio also sent the letter personally, rather than sending the letter through Human Resources.

49.     Mr. Davis returned to work on June 6, 2016.  Despite the requests from his health care providers that he be moved to a different position or different division outside of Mr. Pecoraio's chain of supervision, and despite the fact that such positions were available and Mr. Davis was well-qualified for those positions, the Bureau did not accommodate his request. Instead, Mr. Davis was compelled to return to his old position under Mr. Pecoraio's supervision.

### Continuing Harassment and Discrimination

50.     After Mr. Davis returned to work, Mr. Pecoraio's discrimination and harassment only worsened.  Knowing about Mr. Davis' PTSD and other mental disorders, Mr. Pecoraio purposefully upped his tactics to trigger Mr. Davis and compel him to leave the Bureau.  Mr. Pecoraio became more verbally abusive, condescending, and disrespectful to Mr. Davis.  He also continued to falsely criticize Mr. Davis on a weekly or daily basis and blame Mr. Davis for problems in which Mr. Davis had no involvement.  Mr. Pecoraio also publicly embarrassed Mr. Davis in front of his colleagues.  Mr. Pecoraio did so at division meetings as well as by coming to Mr. Davis' desk and loudly criticizing him within earshot of several of Mr. Davis' teammates. Not only did this embarrass and humiliate Mr. Davis, it also made Mr. Davis' coworkers extremely uncomfortable and led to Mr. Davis' isolation in the office.

51.     For example, the week Mr. Davis returned to the office, he contacted the Bureau's network administration division to regain access to the Bureau's system.  Regaining access was the only way Mr. Davis was able to do any work.  Mr. Pecoraio chastised Mr. Davis for contacting that division directly, rather than going through Mr. Pecoraio.  Mr. Pecoraio had never before indicated that Mr. Davis should go through him, it was standard practice for employees to contact that division themselves, and Mr. Pecoraio had failed to set up Mr. Davis' access prior to his return, despite having sufficient notice of Mr. Davis' return date.

52.     Shortly after Mr. Davis returned, Mr. Pecoraio also began criticizing Mr. Davis for supposed "tardiness," even though he was not tardy.  Mr. Pecoraio claimed Mr. Davis was not working his assigned schedule, although Mr. Davis was in fact working the schedule Mr. Pecoraio had approved seven months before.  Mr. Pecoraio went so far as to reject Mr. Davis' time and attendance records, which forced Mr. Davis to take leave for the time he was supposedly, but not actually, missing.  In a similar fashion, Mr. Pecoraio forced Mr. Davis to fill out leave slips for supposedly being late to work, even when Mr. Davis was not late.  These were all ploys to paper Mr. Davis' personnel file with negative comments and criticisms to impede Mr. Davis' future career progression and to trigger Mr. Davis' PTSD and other mental disabilities to force him out of the Bureau.

53.     Upon Mr. Davis' return from medical leave, Mr. Pecoraio also took steps to purposefully deflate Mr. Davis' annual formal performance review in another effort to stymie his career.

54.     In August 2015, Mr. Davis received a mid-year review of "great."  Immediately prior to taking medical leave and before Mr. Pecoraio knew Mr. Davis was going to take leave, Mr. Pecoraio and Mr. Davis met to discuss Mr. Davis' continued performance for the year.  At that time, Mr. Pecoraio told Mr. Davis he was on track for a rating of "exceeds."

55.     When Mr. Davis returned from medical leave, he received his annual performance review on June 9, 2016.  Mr. Davis' rating at that time was only "full satisfactory."  Mr. Davis' performance warranted an exceeds, and he was told by Mr. Pecoraio his performance warranted an "exceeds" before he took medical leave.  The only intervening event between Mr. Pecoraio telling him he would receive an "exceeds" and him receiving the reduced "full satisfactory" was

his medical absence which, by Bureau policy, cannot be used to reduce an employee's performance rating.

56.     Mr. Davis tried to discuss his rating with Mr. Pecoraio and gain an understanding of why Mr. Pecoraio would suddenly reduce his rating.  Mr. Pecoraio dismissed Mr. Davis' concerns out of hand and would not listen to Mr. Davis or change his rating.

57.     The deflated performance review is significant.  Mr. Davis' personnel record was permanently tarnished with a false rating indicating only mediocre performance.  With respect to future promotion opportunities, Mr. Davis would lose out when compared to other candidates who, all else being equal, had superior performance ratings.

58.     In October 2016, Mr. Davis received a new supervisor, Julian Castaneda (Hispanic Male).  Mr. Pecoraio then became Mr. Davis' second-line supervisor.  Although Mr. Pecoraio was no longer directly over Mr. Davis, he remained in Mr. Davis' chain of command and inflicted his harassing, antagonizing, and belittling conduct through Mr. Castaneda and his other subordinates.  In particular, Mr. Pecoraio directed Mr. Castaneda and his subordinates to issue Mr. Davis unfair letters of reprimand to include in Mr. Davis' personnel file.

59.     For example, on January 31, 2017, Mr. Castaneda issued a letter of reprimand falsely criticizing Mr. Davis for failing to meet a deadline and for incorrectly inputting information into a Bureau system.  Neither criticism was justified—Mr. Davis made no such errors and did not miss any assigned deadline.  The January 31 letter also falsely criticized Mr. Davis for tardiness.

60.     As another example, on June 21, 2017, Mr. Pecoraio had John Stahley, another subordinate, provide a written statement falsely criticizing Mr. Davis for being late.  No other

employees, including those who were actually, chronically late, were issued these types of reprimands.

61.     Even after being moved to Mr. Davis' second line of supervision, Mr. Pecoraio also still continued to falsely criticize Mr. Davis himself and take opportunities to belittle and demean him.  For example, in early February 2017, Mr. Pecoraio harshly criticized Mr. Davis for errors in an audit letter he drafted.  However, that same audit letter whet through three other layers of review before it got to Mr. Pecoraio.  The supposed "errors" were not changed or caught by any of the reviewers, none of whom were reprimanded.  Mr. Pecoraio's criticism of Mr. Davis was not warranted under the circumstances.

62.     Beginning in early 2017 and continuing thereafter, Mr. Pecoraio also began excluding Mr. Davis from analyst meetings.  These were important meetings where roles, responsibilities, and tasks were discussed among the division's analysts.  Mr. Davis was excluded at least once a month.  Without being able to attend the meetings, Mr. Davis was left at a disadvantage in the office and was further ostracized and separated from his colleagues.

63.     In March 2017, Mr. Pecoraio also took a second opportunity to lower Mr. Davis' annual performance review.  Mr. Castaneda, who was Mr. Davis' first line supervisor and the individual responsible for conducting his evaluation, gave Mr. Davis a rating of "exceeds." However, Mr. Pecoraio vetoed that review and instead issued Mr. Davis another deflated "full satisfactory" review.  Mr. Davis had achieved all of his goals for the year and deserved at least an "exceeds" rating.  Despite requests from Mr. Davis, Mr. Pecoraio again refused to even entertain a change to the rating.

64.     Mr. Pecoraio even went so far as to use physical obscene gestures towards Mr. Davis.  On one occasion in August 2017, Mr. Davis was walking down a hallway when he

noticed Mr. Pecoraio behind him.  When Mr. Pecoraio caught Mr. Davis' eye, Mr. Pecoraio

made an obscene and threatening gesture with his hands towards Mr. Davis.  Throughout 2017,

when Mr. Pecoraio passed Mr. Davis in the hallway he also leered at Mr. Davis and gave him

nasty, threatening looks.

65.     Following the incident with the obscene gesture, Mr. Davis requested, consistent

with Bureau policy when an employee feels threatened by another Bureau employee, that the

Bureau complete a threat assessment regarding Mr. Pecoraio.  Mr. Davis' request was submitted

on August 23, 2017.  The Bureau never conducted that assessment.  Mr. Davis followed up with

several individuals, including representatives of Human Resources and the Assistant Director of

Program Review, none of whom could supply him with the assessment.

66.     Mr. Pecoraio's behavior was so harassing and had eroded Mr. Davis' mental

health to such a significant degree that Mr. Davis was forced to take an early retirement from the

Bureau on December 31, 2017.  This was Mr. Pecoraio's ultimate goal.  As he knew it would,

Mr. Pecoraio's conduct was a terrible trigger for Mr. Davis' PTSD and other mental disorders

and was designed specifically to force Mr. Davis to leave the Bureau.  Had Mr. Davis not been

subjected to Mr. Pecoraio's illegal behavior or had Mr. Davis been reassigned out of Mr.

Pecoraio's chain of supervision as requested by his medical providers, he would not have retired

and he would have continued his career with the Bureau.

**COUNT I**
**Hostile Work Environment (Race) – Title VII**

67.     Mr. Davis re-alleges and incorporates by reference Paragraphs 1 through 66 as if

set forth fully herein.

17

68.     The Bureau, through the acts of its agent Mr. Pecoraio, with the intent of discriminating against Mr. Davis, engaged in a pattern of discriminatory behavior on the basis of Mr. Davis' race (African-American) as described herein.  Mr. Davis was, for example:

a.  Unfairly and harshly criticized for not legitimate reason;

b.  Unfairly blamed for the poor work of others;

c.  Denied appropriate training or instruction and, when seeking out instruction or training, being chastised for doing so;

d.  Had his suggestions and requests dismissed and disregarded;

e.  Unfairly and unreasonably embarrassed in front of colleagues so as to become ostracized in the office;

f.  Issued false letters of reprimand and having his personnel file papered with false documentation;

g.  Denied a blackberry or laptop to be able to effectively and efficiently perform work while on the road traveling;

h.  Removed from the travel calendar, effectively serving as a demotion;

i.  Unfairly pushed to forego medical leave for a serious mental health issue;

j.  Had his serious mental health issue inappropriately picked apart by Mr. Pecoraio and having Mr. Pecoraio improperly inquire into his condition;

k.  Had his annual performance reviews unfairly deflated two years in a row;

l.  Falsely criticized for being tardy or missing work;

m.  Blocked from attending important meetings; and

n.  Yelled at and subjected to obscene gestures and threatening leering.

69.     None of the non-African-American employees were treated in the same or similar manner by Mr. Pecoraio.

70.     Mr. Davis' race was the motivating factor for the discriminatory and retaliatory conduct.

71.     Mr. Davis did not welcome this conduct and perceived the working environment to be abusive and hostile.  A reasonable person in Mr. Davis' circumstances would consider the work environment to be abusive or hostile.

72.     The Bureau's conduct was sufficiently severe and/or pervasive to alter the conditions of Mr. Davis' employment and create an abusive and/or hostile working environment in violation of Title VII.  The conduct was so severe that it ultimately resulted in Mr. Davis' constructive discharge and forced retirement.

73.     As a direct and proximate result of the Bureau's discriminatory conduct, Mr. Davis has suffered and continues to suffer injury and damage in the form of past and future loss of income and benefits of employment, lost career and business opportunities and advancements, damage to reputation, humiliation, embarrassment, fear of job loss, diminished self-confidence and self-worth, feelings of helplessness and hopelessness, fear and concern for his future ability to earn a living, and emotional distress.

74.     Due to the conscious, wanton, and or reckless disregard for Mr. Davis' federally protected rights and the severity of the Bureau's conduct, Mr. Davis is entitled to punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Davis prays on his behalf that this Court grant judgment in his favor against the Bureau, and further:

A. Award lost future wages and lost earnings capacity in an amount not less than $300,000;

B. Award compensatory damages, consisting of pecuniary and non-pecuniary losses, humiliation, embarrassment, mental anguish and emotional distress caused by the Bureau's acts in an amount not less than $600,000;

C. Award punitive and exemplary damages, to be determined by a jury, and in any event no less than $300,000;

D. Award reasonable attorney's fees and costs; and

E. Order such other relief as this Court deems just and equitable.

## COUNT II
### Discrimination (Race) – Title VII

75. Mr. Davis re-alleges and incorporates by reference Paragraphs 1 through 66 as if set forth fully herein.

76. The Bureau, with the intent of discriminating against Mr. Davis, engaged in a pattern of discriminatory behavior based on Mr. Davis' race (African-American) as described herein, and, based on or as a result of that discrimination, removed Mr. Davis' travel and external audit responsibilities, thereby creating an effective demotion for Mr. Davis and removing from him his substantive responsibilities and relegating him to purely office-based administrative tasks only.

77. Mr. Davis' race was the motivating factor for the removal of duties.

78. As a direct and proximate result of the Bureau's discriminatory conduct, Mr. Davis has suffered and continues to suffer injury and damage in the form of past and future loss of income and benefits of employment, lost career and business opportunities and advancements, damage to reputation, humiliation, embarrassment, fear of job loss, diminished self-confidence

and self-worth, feelings of helplessness and hopelessness, fear and concern for his future ability to earn a living, and emotional distress.

79.     Due to the conscious, wanton, and or reckless disregard for Mr. Davis' federally protected rights and the severity of the Bureau's conduct, Mr. Davis is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Davis prays on his behalf that this Court grant judgment in his favor against the Bureau, and further:

A.  Award lost future wages and lost earnings capacity in an amount not less than $300,000;

B.  Award compensatory damages, consisting of pecuniary and non-pecuniary losses, humiliation, embarrassment, mental anguish and emotional distress caused by the Bureau's acts in an amount not less than $600,000;

C.  Award punitive and exemplary damages, to be determined by a jury, and in any event no less than $300,000;

D.  Award reasonable attorney's fees and costs; and

E.  Order such other relief as this Court deems just and equitable.

## COUNT III
### Retaliation – Title VII

80.     Mr. Davis re-alleges and incorporates by reference Paragraphs 1 through 66 as if set forth fully herein.

81.     Mr. Davis openly participated in the EEO process on behalf of another employee, Ms. Hines, alleging race discrimination and openly opposed and challenged discrimination therein.

82.     After and as a direct and proximate result of Mr. Davis exercising his rights under Title VII, the Bureau, through the acts of Mr. Pecoraio, with the intent of retaliating against Mr. Davis, engaged in a pattern of retaliatory behavior as described herein.  Mr. Davis was, for example:

    a.   Unfairly and harshly criticized for not legitimate reason;

    b.   Unfairly blamed for the poor work of others;

    c.   Had his suggestions and requests dismissed and disregarded;

    d.   Unfairly and unreasonably embarrassed in front of colleagues so as to become ostracized in the office;

    e.   Issued false letters of reprimand and having his personnel file papered with false documentation;

    f.   Removed from the travel calendar, effectively serving as a demotion;

    g.   Unfairly pushed to forego medical leave for a serious mental health issue;

    h.   Had his serious mental health issue inappropriately picked apart by Mr. Pecoraio and having Mr. Pecoraio improperly inquire into his condition;

    i.   Had his annual performance reviews unfairly deflated two years in a row;

    j.   Falsely criticized for being tardy or missing work;

    k.   Blocked from attending important meetings; and

    l.   Yelled at and subjected to obscene gestures and threatening leering.

83.     The foregoing conduct was designed to and was sufficient to discourage and dissuade a reasonable person from pursuing or aiding in the EEO process.  The conduct was so severe that it ultimately resulted in Mr. Davis' constructive discharge and forced retirement.

84.     As a direct and proximate result of the Bureau's discriminatory conduct, Mr. Davis has suffered and continues to suffer injury and damage in the form of past and future loss of income and benefits of employment, lost career and business opportunities and advancements, damage to reputation, humiliation, embarrassment, fear of job loss, diminished self-confidence and self-worth, feelings of helplessness and hopelessness, fear and concern for his future ability to earn a living, and emotional distress.

85.     Due to the conscious, wanton, and or reckless disregard for Mr. Davis' federally protected rights and the severity of the Bureau's conduct, Mr. Davis is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Davis prays on his behalf that this Court grant judgment in his favor against the Bureau, and further:

A.  Award lost future wages and lost earnings capacity in an amount not less than $300,000;

B.  Award compensatory damages, consisting of pecuniary and non-pecuniary losses, humiliation, embarrassment, mental anguish and emotional distress caused by the Bureau's acts in an amount not less than $600,000;

C.  Award punitive and exemplary damages, to be determined by a jury, and in any event no less than $300,000;

D.  Award reasonable attorney's fees and costs; and

E.  Order such other relief as this Court deems just and equitable.

## COUNT IV
### Retaliatory Hostile Work Environment – Title VII

86.     Mr. Davis re-alleges and incorporates by reference Paragraphs 1 through 66 as if set forth fully herein.

87.    Mr. Davis openly participated in the EEO process on behalf of another employee, Ms. Hines, alleging race discrimination and openly opposed and challenged discrimination therein.

88.    After and as a direct and proximate result of Mr. Davis exercising his rights under Title VII, the Bureau, through the acts of Mr. Pecoraio, with the intent of retaliating against Mr. Davis, engaged in a pattern of retaliatory behavior as described herein.  Mr. Davis was, for example:

a.   Unfairly and harshly criticized for not legitimate reason;

b.   Unfairly blamed for the poor work of others;

c.   Had his suggestions and requests dismissed and disregarded;

d.   Unfairly and unreasonably embarrassed in front of colleagues so as to become ostracized in the office;

e.   Issued false letters of reprimand and having his personnel file papered with false documentation;

f.   Removed from the travel calendar, effectively serving as a demotion;

g.   Unfairly pushed to forego medical leave for a serious mental health issue;

h.   Had his serious mental health issue inappropriately picked apart by Mr. Pecoraio and having Mr. Pecoraio improperly inquire into his condition;

i.   Had his annual performance reviews unfairly deflated two years in a row;

j.   Falsely criticized for being tardy or missing work;

k.   Blocked from attending important meetings; and

l.   Yelled at and subjected to obscene gestures and threatening leering.

89.     Mr. Davis' participation in Ms. Hines' EEO process was the motivating factor for the retaliatory conduct.

90.     Mr. Davis did not welcome this conduct and perceived the working environment to be abusive and hostile.  A reasonable person in Mr. Davis' circumstances would consider the work environment to be abusive or hostile.

91.     The Bureau's conduct was sufficiently severe and/or pervasive to alter the conditions of Mr. Davis' employment and create an abusive and/or hostile working environment in violation of Title VII.  The conduct was so severe that it ultimately resulted in Mr. Davis' constructive discharge and forced retirement.

92.     As a direct and proximate result of the Bureau's discriminatory conduct, Mr. Davis has suffered and continues to suffer injury and damage in the form of past and future loss of income and benefits of employment, lost career and business opportunities and advancements, damage to reputation, humiliation, embarrassment, fear of job loss, diminished self-confidence and self-worth, feelings of helplessness and hopelessness, fear and concern for his future ability to earn a living, and emotional distress.

93.     Due to the conscious, wanton, and or reckless disregard for Mr. Davis' federally protected rights and the severity of the Bureau's conduct, Mr. Davis is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Davis prays on his behalf that this Court grant judgment in his favor against the Bureau, and further:

A.  Award lost future wages and lost earnings capacity in an amount not less than $300,000;

B. Award compensatory damages, consisting of pecuniary and non-pecuniary losses, humiliation, embarrassment, mental anguish and emotional distress caused by the Bureau's acts in an amount not less than $600,000;

C. Award punitive and exemplary damages, to be determined by a jury, and in any event no less than $300,000;

D. Award reasonable attorney's fees and costs; and

E. Order such other relief as this Court deems just and equitable.

**COUNT V**
**Hostile Work Environment (Disability) – Rehabilitation Act**

94.     Mr. Davis re-alleges and incorporates by reference Paragraphs 1 through 66 as if set forth fully herein.

95.     Mr. Davis is an individual with a disability within the meaning of the Rehabilitation Act and the Americans with Disabilities Act ("ADA") and falls within the protected class of those statutes.  Now and at the times of the incidents outlined above, Mr. Davis suffers from anxiety, depression, and PTSD.  These disabilities substantially limit Mr. Davis' life activities, including, but not limited to, working, sleeping, and eating.

96.     Throughout his employment with the Bureau, including at the time of his termination, Mr. Davis was performing the job at a level that met and exceeded the Bureau's legitimate expectations.  Mr. Davis fully performed all duties, responsibilities, and functions required of him by the Bureau, with or without reasonable accommodation.

97.     The Bureau, through the acts of its agent Mr. Pecoraio, with the intent of discriminating against Mr. Davis, engaged in a pattern of discriminatory behavior on the basis of Mr. Davis' disability as described herein.  Mr. Davis was, for example:

a.   Unfairly and harshly criticized for not legitimate reason;

26

b.   Unfairly blamed for the poor work of others;

c.   Had his suggestions and requests dismissed and disregarded;

d.   Unfairly and unreasonably embarrassed in front of colleagues so as to become ostracized in the office;

e.   Issued false letters of reprimand and having his personnel file papered with false documentation;

f.   Unfairly pushed to forego medical leave for a serious mental health issue;

g.   Had his serious mental health issue inappropriately picked apart by Mr. Pecoraio and having Mr. Pecoraio improperly inquire into his condition;

h.   Had his annual performance reviews unfairly deflated two years in a row;

i.   Falsely criticized for being tardy or missing work;

j.   Blocked from attending important meetings; and

k.   Yelled at and subjected to obscene gestures and threatening leering.

98.     None of the non-disabled employees were treated in the same or similar manner by Mr. Pecoraio.

99.     The conduct was sufficiently severe and/or pervasive to alter the terms and conditions of Mr. Davis' employment and create and abusive and/or hostile working environment.  The conduct was so severe that it ultimately resulted in Mr. Davis' constructive discharge and forced retirement.

100.     Mr. Davis perceived the working environment to be abusive and hostile as a result of the conduct, and a reasonable person in Mr. Davis' circumstances would consider the work environment to be abusive or hostile.

101.     Mr. Davis brought the hostile work environment to the attention of the Bureau, specifically the Assistant Director, the EAP, and Human Resources; however, the Bureau failed to take adequate measures to eliminate the hostile work environment.

102.     As a direct and proximate result of the Bureau's discriminatory conduct, Mr. Davis has suffered and continues to suffer injury and damage in the form of past and future loss of income and benefits of employment, lost career and business opportunities and advancements, damage to reputation, humiliation, embarrassment, fear of job loss, diminished self-confidence and self-worth, feelings of helplessness and hopelessness, fear and concern for his future ability to earn a living, and emotional distress.

103.     Due to the conscious, wanton, and or reckless disregard for Mr. Davis' federally protected rights and the severity of the Bureau's conduct, Mr. Davis is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Davis prays on his behalf that this Court grant judgment in his favor against the Bureau, and further:

A.  Award lost future wages and lost earnings capacity in an amount not less than $300,000;

B.  Award compensatory damages, consisting of pecuniary and non-pecuniary losses, humiliation, embarrassment, mental anguish and emotional distress caused by the Bureau's acts in an amount not less than $600,000;

C.  Award punitive and exemplary damages, to be determined by a jury, and in any event no less than $300,000;

D.  Award reasonable attorney's fees and costs; and

E.  Order such other relief as this Court deems just and equitable.

**COUNT VI**
**Hostile Work Environment (Regarded As Disabled) – Rehabilitation Act**

104.     Mr. Davis re-alleges and incorporates by reference Paragraphs 1 through 66 as if set forth fully herein.

105.     Mr. Davis was regarded by the Bureau as having a disability within the meaning of the Rehabilitation Act and the ADA and falls within the protected class of those statutes.  Now and at the times of the incidents outlined above, Mr. Davis suffers from anxiety, depression, and PTSD.  At the time of the incidents outlined above, the Bureau perceived Mr. Davis as having a mental impairment from these conditions which had an actual or expected duration of greater than six months.

106.     Throughout his employment with the Bureau, including at the time of his termination, Mr. Davis was performing the job at a level that met and exceeded the Bureau's legitimate expectations.  Mr. Davis fully performed all duties, responsibilities, and functions required of him by the Bureau, with or without reasonable accommodation.

107.     The Bureau, through the acts of its agent Mr. Pecoraio, with the intent of discriminating against Mr. Davis, engaged in a pattern of discriminatory behavior on the basis of Mr. Davis' disability as described herein.  Mr. Davis was, for example:

   a.   Unfairly and harshly criticized for not legitimate reason;

   b.   Unfairly blamed for the poor work of others;

   c.   Had his suggestions and requests dismissed and disregarded;

   d.   Unfairly and unreasonably embarrassed in front of colleagues so as to become ostracized in the office;

   e.   Issued false letters of reprimand and having his personnel file papered with false documentation;

  f. Unfairly pushed to forego medical leave for a serious mental health issue;

  g. Had his serious mental health issue inappropriately picked apart by Mr. Pecoraio and having Mr. Pecoraio improperly inquire into his condition;

  h. Had his annual performance reviews unfairly deflated two years in a row;

  i. Falsely criticized for being tardy or missing work;

  j. Blocked from attending important meetings; and

  k. Yelled at and subjected to obscene gestures and threatening leering.

108. None of the non-disabled employees were treated in the same or similar manner by Mr. Pecoraio.

109. The conduct was sufficiently severe and/or pervasive to alter the terms and conditions of Mr. Davis' employment and create and abusive and/or hostile working environment.  The conduct was so severe that it ultimately resulted in Mr. Davis' constructive discharge and forced retirement.

110. Mr. Davis perceived the working environment to be abusive and hostile as a result of the conduct, and a reasonable person in Mr. Davis' circumstances would consider the work environment to be abusive or hostile.

111. Mr. Davis brought the hostile work environment to the attention of the Bureau, specifically the Assistant Director, the EAP, and Human Resources; however, the Bureau failed to take adequate measures to eliminate the hostile work environment.

112. As a direct and proximate result of the Bureau's discriminatory conduct, Mr. Davis has suffered and continues to suffer injury and damage in the form of past and future loss of income and benefits of employment, lost career and business opportunities and advancements, damage to reputation, humiliation, embarrassment, fear of job loss, diminished self-confidence

30

and self-worth, feelings of helplessness and hopelessness, fear and concern for his future ability to earn a living, and emotional distress.

113.    Due to the conscious, wanton, and or reckless disregard for Mr. Davis' federally protected rights and the severity of the Bureau's conduct, Mr. Davis is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Davis prays on his behalf that this Court grant judgment in his favor against the Bureau, and further:

A.  Award lost future wages and lost earnings capacity in an amount not less than $300,000;

B.  Award compensatory damages, consisting of pecuniary and non-pecuniary losses, humiliation, embarrassment, mental anguish and emotional distress caused by the Bureau's acts in an amount not less than $600,000;

C.  Award punitive and exemplary damages, to be determined by a jury, and in any event no less than $300,000;

D.  Award reasonable attorney's fees and costs; and

E.  Order such other relief as this Court deems just and equitable.

## COUNT VII
### Failure to Accommodate – Rehabilitation Act

114.    Mr. Davis re-alleges and incorporates by reference Paragraphs 1 through 66 as if set forth fully herein.

115.    The Bureau violated the Rehabilitation Act when it failed to provide a reasonable accommodation to Mr. Davis.

116.    Mr. Davis is an individual with a disability within the meaning of the Rehabilitation Act and the Americans with Disabilities Act ("ADA") and falls within the

protected class of those statutes.  Now and at the times of the incidents outlined above, Mr. Davis

suffers from anxiety, depression, and PTSD.  These disabilities substantially limit Mr. Davis' life

activities, including, but not limited to, working, sleeping, and eating.

117.     The Bureau had notice of Mr. Davis' disability.  Mr. Davis notified his supervisor

and human resources of his disability, Mr. Davis was seen by a Bureau EAP counselor, and Mr.

Davis submitted medical documentation regarding his disability to the Bureau.

118.     With reasonable accommodation, Mr. Davis could perform the essential functions

of his position.  Throughout his time at central office, Mr. Davis performed each of his essential

job functions, responsibilities, and duties before his medical leave.

119.     The Bureau refused to provide Mr. Davis with reasonable accommodation in the

form of reassignment to a new division not under the supervision or chain of command of Mr.

Pecoraio.

120.     As a direct and proximate result of the Bureau's discriminatory conduct, Mr.

Davis has suffered and continues to suffer injury and damage in the form of past and future loss

of income and benefits of employment, lost career and business opportunities and advancements,

damage to reputation, humiliation, embarrassment, fear of job loss, diminished self-confidence

and self-worth, feelings of helplessness and hopelessness, fear and concern for his future ability

to earn a living, and emotional distress.

121.     Due to the conscious, wanton, and or reckless disregard for Mr. Davis' federally

protected rights and the severity of the Bureau's conduct, Mr. Davis is entitled to punitive

damages.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Davis prays on his behalf that this Court grant judgment in his favor against the Bureau, and further:

A.  Award lost future wages and lost earnings capacity in an amount not less than $300,000;

B.  Award compensatory damages, consisting of pecuniary and non-pecuniary losses, humiliation, embarrassment, mental anguish and emotional distress caused by the Bureau's acts in an amount not less than $600,000;

C.  Award punitive and exemplary damages, to be determined by a jury, and in any event no less than $300,000;

D.  Award reasonable attorney's fees and costs; and

E.  Order such other relief as this Court deems just and equitable.

## COUNT VIII
### Improper Medical Inquiry – Rehabilitation Act

122.    Mr. Davis re-alleges and incorporates by reference Paragraphs 1 through 66 as if set forth fully herein.

123.    The Bureau violated the Rehabilitation Act when, through Mr. Pecoraio, engaged in improper medical inquiries regarding Mr. Davis.

124.    Mr. Davis is an individual with a disability within the meaning of the Rehabilitation Act and the Americans with Disabilities Act ("ADA") and falls within the protected class of those statutes.  Now and at the times of the incidents outlined above, Mr. Davis suffers from anxiety, depression, and PTSD.  These disabilities substantially limit Mr. Davis' life activities, including, but not limited to, working, sleeping, and eating.

125.    The Bureau engaged in unlawful discrimination by making an inquiry of Mr. Davis as to whether Mr. Davis was an individual with a disability and as to the nature and

severity of Mr. Davis' disability, including when Mr. Davis first announced he intended to take a leave of absence and then via the eight-point letter when Mr. Davis was cleared to return to work. These inquiries were not job-related or consistent with business necessity.

126. The Bureau's inquiry violated 29 C.F.R. § 1614.203(b) and 42 U.S.C. § 12112(d)(4)(A).

127. As a direct and proximate result of the Bureau's discriminatory conduct, Mr. Davis has suffered and continues to suffer injury and damage in the form of past and future loss of income and benefits of employment, lost career and business opportunities and advancements, damage to reputation, humiliation, embarrassment, fear of job loss, diminished self-confidence and self-worth, feelings of helplessness and hopelessness, fear and concern for his future ability to earn a living, and emotional distress.

128. Due to the conscious, wanton, and or reckless disregard for Mr. Davis' federally protected rights and the severity of the Bureau's conduct, Mr. Davis is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Davis prays on his behalf that this Court grant judgment in his favor against the Bureau, and further:

A. Award lost future wages and lost earnings capacity in an amount not less than $300,000;

B. Award compensatory damages, consisting of pecuniary and non-pecuniary losses, humiliation, embarrassment, mental anguish and emotional distress caused by the Bureau's acts in an amount not less than $600,000;

C. Award punitive and exemplary damages, to be determined by a jury, and in any event no less than $300,000;

D.  Award reasonable attorney's fees and costs; and

E.  Order such other relief as this Court deems just and equitable.


Respectfully Submitted,


_____/s/ Nicholas Hantzes_____
Nicholas Hantzes, DC Bar No. 361450
Michael Hall, Fed. DC Bar No. VA016
HANTZES & ASSOCIATES
1749 Old Meadow Road, Suite 308
McLean, Virginia 22102
Tel: (703) 378-5000
Fax: (703) 448-4434
nhantzes@hantzeslaw.com
mhall@hantzeslaw.com
*Counsel for Plaintiff*


## DEMAND FOR JURY TRIAL

Mr. Davis demands a trial on all claims to which he is entitled to a jury.


Respectfully Submitted,


_____/s/ Nicholas Hantzes_____
Nicholas Hantzes, DC Bar No. 361450
Michael Hall, Fed. DC Bar No. VA016
HANTZES & ASSOCIATES
1749 Old Meadow Road, Suite 308
McLean, Virginia 22102
Tel: (703) 378-5000
Fax: (703) 448-4434
nhantzes@hantzeslaw.com
mhall@hantzeslaw.com
*Counsel for Plaintiff*